UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Lucas Rijper Greenidge, | Case No. |
| Plaintiff, | COMPLAINT |
| — against — | JURY TRIAL DEMANDED |
| Michael McGuire, Salvatore Provenzano, Carl Rordamel, Nicolaos Tjortjoglou, Jillian Flanagan, Matthew Miller, and John Does #1-5 | |
| Defendants. | |

## NATURE OF THE ACTION

1.      This is an action for false arrest and excessive force that arose when police officers in the New York City Police Department saw two Black men surrounded by a group of white men, bloodied, and decided that they were the perpetrators of a crime.

2.      Rather than perpetrating a crime, Plaintiff and his brother, had been victims of a violent assault.  It was Plaintiff who had called the police asking for help.

3.      Rather than receive help, Plaintiff was tased, assaulted, arrested, and falsely charged with felony robbery.

4.      Even after watching video of the assault Mr. Greenidge suffered, the officers fabricated the robbery charges against him.  Once prosecutors received the video and spoke to Mr. Greenidge, they dismissed the false charges.

## JURISDICTION AND VENUE

5.      This action arises under 42 U.S.C. §§ 1983 and 1988 in addition to the laws of the State of New York.

6.      Jurisdiction lies in this Court over claims against employees of the New York City Police Department under its federal question and civil rights jurisdiction, 28 U.S.C. §§ 1331 and 1343.

## PARTIES

7.      Plaintiff Lucas Greenidge is a resident of New York City.

8.      Defendant Michael McGuire is an NYPD police officer living in New York.

9.      Defendant Salvatorre Provenzano is an NYPD police officer living in New York.

10.     Defendant Carl Rordamel is an NYPD police officer living in New York.

11.     Defendant Nicolaos Tjortjoglou is an NYPD police officer living in New York.

12.     Defendant Jillian Flanagan is an NYPD police officer living in New York.

13.     Defendant Matthew Miller is an NYPD police officer living in New York.

14.     John Doe Defendants ##1-5 are NYPD police officers living in New York City.

## GENERAL ALLEGATIONS

15.     On August 10, 2020, Plaintiff Lucas Rijper-Greenidge ("Mr. Greenidge") visited his former business partner, Nick Spanos, to collect some of the substantial sums

of money that Mr. Spanos contractually owed him and to discuss a plan for Mr. Spanos to repay the funds he had stolen from Mr. Greenidge over time.

16.     Mr. Spanos had been falsely accusing Mr. Greenidge of financial wrongdoing, when in fact he had been stealing from Mr. Greenidge.

17.     In 2014, Mr. Spanos and Mr. Greenidge co-founded a company called Prometheus Assets LLC, a Bitcoin trading operation that was, at the time, one of the largest and most profitable Bitcoin trading operations in the country.

18.     In the time Mr. Greenidge and Mr. Spanos worked at Prometheus Assets together, Mr. Greenidge managed the day-to-day operations such as trading strategy and served as the company's Anti-Money Laundering (AML) Compliance Officer overseeing AML-KYC (Know Your Customer) operations.

19.     Mr. Greenidge left the company abruptly, at a time when the company was extremely profitable, because Mr. Spanos asked him to use his position as AML compliance officer to launder proceeds of criminal activity.

20.     In August 2020, when the incident occurred, Mr. Spanos owed Mr. Greenidge money, documented in the form of smart contracts.  Smart contracts are contracts that automatically execute when certain events are undertaken, without need for an intermediary or escrow.  These contracts were the ownership documents for millions of dollars in cash and Bitcoin.

21.     Additionally, Mr. Greenidge believed Mr. Spanos was responsible for money that had been wired out of Mr. Greenidge's personal bank accounts, business

3

accounts, and sent from Bitcoin wallets without his knowledge or consent. He also believed Mr. Spanos and his associates had stolen other property from him.

22.     On August 10, 2020, Mr. Greenidge planned to execute the smart contracts, which would lead to the transfer of Bitcoin to his personal Bitcoin wallet. Mr. Greenidge brought his brother Miles along with him as a witness.

23.     In addition to needing to visit the Bitcoin Center to execute the smart contracts, Mr. Greenidge went there that day because Mr. Spanos had invited him to work out a "payment plan," to repay Mr. Greenidge the money Mr. Spanos owed him.

24.     Though he had invited Mr. Greendige to meet with him on August 10, 2020, Mr. Spanos had repeatedly made efforts to deter Mr. Greenidge from coming and collecting the money to which he was entitled, including making false accusations against him and threatening to harm him if he came to collect. Mr. Spanos had also been illegally using Mr. Greenidge's phone, "sim swapping" his phone and pretending to be him.

25.     Mr. Spanos's threats were made good when Mr. Greenidge, by invitation, came to the Bitcoin Center to obtain payment.

26.     Upon arriving at the Bitcoin Center to attempt to execute his contracts and/or workout a "payment plan" with Mr. Spanos for the money he was owed, a group of men who worked for or with Mr. Spanos assaulted Mr. Greenidge and his brother.

27.     The group of men tore Mr. Greenidge's shirt off, punched, kicked, and choked him, and took some of his papers.

28.     This still shows the assault, Mr. Greenidge as on the ground, surrounded by Mr. Spanos and his associates:



29.     Mr. Greenidge, doing what citizens should be able to do upon being assaulted, called the police.

30.     The defendant officers then arrived on the scene.

31.     They observed two Black men (Mr. Greenidge and his brother) surrounded by a group of white men (Mr. Spanos and his associates).

32.     The two men looked as though they had been beaten severely, and Mr. Greenidge had his shirt ripped off.

33.     Mr. Greenidge had his hands in the air, and his brother put himself straight on the ground.

34.     This still from security footage at the scene shows Mr. Greenidge with his hands raised, and the men who had assaulted him – who he had called the police on to

request their aide – standing casually.



35.     After Mr. Spanos pointed at Mr. Greenidge, as shown in the security footage image above, Officer McGuire tased Mr. Greenidge.

36.     Officer McGuire had his taser drawn as he walked into the building.

37.     He tased Mr. Greenidge for over ten seconds before he eventually shocked himself and stopped.

38.     The tasing was completely and utterly unjustified by the circumstances, and the continued tasing after the initial strike was malicious and wanton.

39.     The group of officers proceed to tackle Mr. Greenidge and assault him for no reason.

40.     The officers destroyed certain of Mr. Greenidge's papers, which included the smart contracts on which he had the right to execute.

41.     Mr. Greenidge told the officers not to destroy the papers, and that they had value to him, namely, the right to Bitcoin and cash.

42.     The officers then stay and chat with the assailants while arresting the men who were assailed.



43.     While officers can only rely on the facts in front of them in making an arrest, they had been called by Mr. Greenidge.  They responded to *his* call for protection.

44.     Even after reviewing video, the officers never arrested the men who assaulted Mr. Greenidge and his brother.

45.     The video not only showed the men assaulting Mr. Greenidge, the video also shows Mr. Spanos disposing of the sim swapped phone after the police arrived on scene.  The video further shows Mr. Spanos taking Mr. Greenidge's phone out of his hand while Mr. Greenidge was calling 911.

46.     Any reasonable investigation would have revealed that it was Mr. Spanos and his associates who should have been arrested and prosecuted.

47.     Mr. Greenidge and his brother were arrested instead.

48.     Mr. Greenidge required medical attention following the assaults and tasing.  When paramedics arrived, however, the police directed the paramedics to treat Mr. Spanos and his associates first, despite the fact that they had suffered no injuries.

49.     Rather than allow Mr. Greenidge to receive medical attention, the police interrogated him at the scene.  It was only after they concluded questioning him that the police took Mr. Greenidge to a nearby hospital.

50.     As Mr. Greenidge's shirt had been ripped off during his assault, he was provided with a used workout shirt to wear for the next several hours. During this time he was subjected to degrading comments and taunting remarks from the defendants.

51.     Though he was taken to the hospital, Mr. Greenidge did not receive medical treatment for his injuries.  Indeed, he waited for hours with the Defendant officers, in a crowded New York City hospital in August 2020, without appropriate personal protective equipment as his N95 mask had been taken at the Bitcoin Center. Mr. Greenidge subsequently contracted Covid.

52.     He was then taken to central bookings and arraigned on felony assault charges among a host of charges.

53.     The officers, who were in possession of the security video, and reviewed it, fabricated evidence and forwarded that evidence to prosecutors, stating untrue facts regarding the incident in the criminal complaint.

54. The officers stated that Mr. Greenidge attempted to flee the scene, which is directly contradicted by the video.

55. The officers stated that Mr. Greenidge came at Mr. Spanos and his associates with a mallet.  He had not.

56. The officers knew that whatever probable cause they had obtained dissipated once they viewed the videos.

57. Mr. Greenidge was forced to pay for a criminal defense attorney to defend the outrageous charges and was placed on supervised release.

58. His business partner left his business because he did not want to be in business with an accused criminal.

59. The charges were dismissed and sealed the day after Mr. Greenidge was charged with them, once the prosecutors reviewed the videos.

60. The fabricated evidence also led to a restraining order being placed against Mr. Greenidge from all Bitcoin Center operations, which included a second Bitcoin ATM at which he could have executed the smart contracts.

61. The restraining order allowed Mr. Spanos to dispose of evidence of his own wrongdoing, which included defrauding Mr. Greenidge and stealing from him.  In fact, he was empowered to do so by the impunity for his actions.

62. Mr. Greenidge was thus harmed twice by their evidence fabrication: first by the loss of his own personal liberty and second by the property loss.

## FIRST CAUSE OF ACTION
Excessive Force Against All Defendants

63.      Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

64.      Defendants collectively used force against Plaintiff that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

65.      The types and levels of force Defendants used against Plaintiff were unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

66.      Defendant McGuire used unreasonable force against Plaintiff in tasing him.

67.      As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

## SECOND CAUSE OF ACTION
Fabrication of Evidence Against Defendants

68.      Plaintiff repeats and realleges each and every allegation set forth above.

69.      At all times, the Defendants were acting under color of State law.

70.      The Fifth and Fourteenth Amendments protect the right to be given a fair trial and not to have false evidence presented against you.

71.     Defendants collectively made false statements in reports provided to prosecutors which led to the prosecution of Mr. Greenidge.

72.     But for forwarding the fabricated evidence Mr. Greenidge would not have been arraigned on charges.

73.     Together, by forwarding false information to the prosecutors that was likely to influence a jury verdict, the Defendants deprived the Plaintiff of his liberty and property.

## THIRD CLAIM FOR RELIEF

### Unlawful Seizure / False Arrest

74.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

75.     Defendants had no judicial warrant authorizing then to seize Plaintiff.

76.     Defendants collectively seized Plaintiff, restricting his freedom of movement, without privilege or lawful justification.

77.     Plaintiff was conscious of his confinements by Defendants.

78.     Plaintiff did not consent to his confinements by Defendants.

79.     It was unreasonable for Defendants to believe that they had lawful cause to seize, detain, or arrest Plaintiff.

80.     Thus, Defendants did not have individualized probable cause to seize, detain, or arrest Plaintiff.

81.     Those Defendants who ordered, effected, and otherwise participated in arresting Plaintiff subjected Plaintiff to unlawful seizures, false arrests, and/or searches and/or seizures of his persons and/or property.

82.     Even if Defendants at one point had probable cause the probable cause dissipated upon receipt of video evidence.

WHEREFORE, Plaintiff Lucas Greenidge demands judgment against the above-captioned Defendants as follows:

a.  For compensatory damages, jointly and severally, in an amount to be determined at trial, but not less than two million dollars;

b.  For punitive damages, jointly and severally, in an amount to be determined at trial;

c.  For reasonable attorneys' fees, costs, and disbursements, under 42 U.S.C. § 1988 and other applicable laws;

d.  For pre- and post-judgment interest as allowed by law; and

e.  For such other relief as this Court deems just and proper.

Dated:  New York, New York
        August 8, 2023

WERTHEIMER LLC

By: _____

Joel A. Wertheimer
Mara Fleder
14 Wall Street, Suite 1603
New York, New York 10005
(646) 720-1098
joel@joelwertheimer.com
mara@joelwertheimer.com